IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | X | |
|---|---|---|
| GLENN COOK, | X | |
| | X | |
| Petitioner, | X | |
| | X | |
| vs. | X | No. 08-2803-STA-cgc |
| | X | |
| ROLAND COLSON, | X | |
| | X | |
| Respondent. | X | |
| | X | |

ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

On November 18, 2008, Petitioner Glenn Cook, Tennessee Department of Correction prisoner number 279188, an inmate at the Turney Center Industrial Complex ("TCIX") in Only, Tennessee, filed a pro se petition pursuant to 28 U.S.C. § 2254, along with a motion for leave to proceed in forma pauperis. (Docket Entries ("D.E.") 1 & 2.) On August 10, 2009, the Court denying the motion for leave to proceed in forma pauperis, directed Petitioner to pay the filing fee, and directed Respondent to file the state-court record and a response to the petition. (D.E. 4.) Respondent filed an answer to the petition on December 23, 2009, along with the state-court record. (D.E. 15 & 16.)

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

On July 17, 1997, following a jury trial in the Criminal Court for Shelby County, Tennessee, Petitioner was convicted of three (3) counts of especially aggravated kidnapping, two (2) counts of aggravated robbery, one (1) count of attempted aggravated robbery, and possession of a handgun in an occupied place. (D.E. 16-1 at 15.).[1]  On September 30, 1997, Cook was sentenced to two consecutive life sentences. (Judgments, D.E. 16-1 at 59-60, 65, 67, 69, 71.) On November 25, 1997, Cook filed a notice of appeal. (D.E. 16-1 at 111.)

On appeal, Cook raised the following issues: (1) the evidence presented at trial was insufficient to sustain the especially aggravated kidnapping convictions and attempted aggravated robbery conviction; (2) the trial court erred by allowing the state to introduce testimony of police officers that they were responding to a "shots-fired" call when they arrested Cook and his brother; (3) the trial court's failure to instruct the jury on facilitation deprived him of a fair trial; and (4) the cumulative effect of the combined errors deprived him of a fair trial. (16-14 at 3, 5, 11-19.) The Tennessee Court of Criminal Appeals affirmed Cook's convictions and sentences. <u>State v. Cook</u>, No. 02C01-9712-CR-00482, 1999 WL 450321 (Tenn. Crim. App. June 30, 1999), <u>perm. app. denied</u> (Tenn. Dec. 20, 1999). Cook did not file

---

[1]    Page citations are to the district court record docket entries.

a petition for writ of certiorari with the United States Supreme Court. (D.E. 1 at 2.)

On May 12, 2000, Cook filed a pro se petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Criminal Court for Shelby County. (Pet. for Relief from Conviction or Sentence, D.E. 16-7 at 27-37.) On June 27, 2000, counsel was appointed to represent Cook, and an amended petition was filed. (Id. at 49, Am. Pet. For Post-Conviction Relief, id. at 44-46.) On September 26, 2001, a colloquy occurred between Cook and the trial court that arose from Cook's desire to amend his petition for a second time. (D.E. 16-8.) On February 6, 2006, the post-conviction court entered a *nunc pro tunc* order appointing a second attorney as of November 14, 2003. (D.E. 16-7 at 62.) The second attorney filed a "petition for Post-conviction Relief" (id. at 38-43) and an "Amendment to Petition for Post-conviction Relief." (Id. at 47-48.) Evidentiary hearings were held on July 25, 2005, and September 22, 2005. (D.E. 16-11, D.E. 16-12.) On January 31, 2006, Petitioner filed a "Statement of Fact and Law Concerning his Post-conviction Hearing(s)." (D.E. 16-7 at 78-86.) On July 5, 2006, the post-conviction court issued an order denying relief. (Order, id. at 89-93.) On July 14, 2006, Cook filed a notice of appeal. (Id. at 94.)

Cook raised issues of ineffective assistance of trial counsel[2] and improper sentencing by the trial court in the post-conviction appeal. (D.E. 16-20 at 6, 11-17.) The Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. Cook v. State, No. W2006-01514-CCA-R3-PC, 2008 WL 821532 (Tenn. Crim. App. Mar. 27, 2008), perm. app. denied (Tenn. Sept. 29, 2008).

Petitioner committed the offenses under review with his twin brother Linn Cook. The facts underlying Petitioner's convictions are set forth in the opinion of the Tennessee Court of Criminal Appeals on direct appeal:

> The record reflects that the [Petitioner and his brother] are identical twins. Christopher Funches testified that on April 14, 1996, he went to a party at Lake Point Apartments with his sister, Marti Funches, and Marti's fiancee, Tony Garrett. He said that as they left the party at about 2:00 a.m. and were walking down the steps, the Cooks approached them. He said Mr. Garrett was in front of him and Ms. Funches, and one of the Cooks struck Mr. Garrett in the face. He said Ms. Funches began screaming, and he tried to calm her down. He said that one brother had a revolver, and the other had a rifle or a shotgun.[3]
>
> Mr. Funches testified that Brother Two approached Mr. Garrett and threatened him. He said that Brother One robbed Mr. Garrett and told him to get into Mr. Garrett's

_____

[2]    The transcript from the evidentiary hearing held on July 25, 2005 makes clear that the all challenges were to the performance of trial counsel, not appellate counsel. (D.E. 16-11 at 6.)

[3]    Although the victims were not able to identify [Petitioner or his brother] individually by name, much of their testimony distinguishes between the two based upon which weapon the defendant was carrying. For purposes of this opinion, the brother carrying the revolver will be referred to as Brother One, and the brother carrying the rifle, shotgun or pipe will be referred to as Brother Two.

car. He stated that the brothers took Ms. Funches's jewelry, and they reached into Mr. Garrett's pockets and might have taken something. He testified that the brothers did not attempt to rob him but asked him if he had a pistol, which he did not. He said the brothers did not pat him down or search him. He said the brothers then forced the three of them into Mr. Garrett's car by pointing a pistol at them. He stated that he and Ms. Funches were in the backseat, Mr. Garrett was in the driver's seat, and Brother One was in the front passenger seat. He said that Brother Two followed them in another car. He said that in Mr. Garrett's car, Brother One threatened to shoot Mr. Garrett. He said that he pleaded with Brother One not to shoot Mr. Garrett because he and Ms. Funches were engaged. He testified that Brother One said that if they told anyone of the incident, Ms. Funches would be a widow.

Mr. Funches testified that Brother One forced Mr. Garrett to drive to the apartment Mr. Garrett and Ms. Funches shared at Perkins Woods. He said that when they arrived, Brother One forced Mr. Garrett out of the car and into the apartment at gunpoint. He said that Brother Two, who had a rifle, stayed with him and Ms. Funches at the car. He said that about ten to fifteen minutes later, Brother One and Mr. Garrett came outside. He said that one of the brothers reached into Mr. Garrett's pocket and took some money. He said the brothers demanded money from Ms. Funches, but she did not have any. He said the brothers then got in their car and left. Mr. Funches testified that he feared for his life during the incident.

On cross-examination, Mr. Funches testified that light came from streetlights not far from the bottom of the steps at Lake Point Apartments and from lights in the stairwell. He said that he had seen the brothers before and that Mr. Garrett knew the brothers. He said that when Brother One first approached Mr. Garrett, Brother One said, "Where your sh* * at." He said he could not hear whether Mr. Garrett said anything to Brother One. He said the brothers took Ms. Funches's necklace at Lake Point Apartments. He stated that the brothers asked him "if he had anything, if he had a gun." He said he thought the brothers were asking him if he had any money and if he had a gun. He said that although he was never directly threatened, he felt his life was threatened because if they would kill Mr. Garrett, they would also kill him.

Mr. Funches testified that at Perkins Woods Apartments, Brother Two stayed in the car with him and Ms. Funches, and he did not remember if Brother Two had a gun. He said Brother Two did not threaten them with a gun. He said that after Brother One and Mr. Garrett came back outside, Brother One went to the passenger side of the car and said, "Give me your money." He said that after they got money from Ms. Funches, they left. He said that Brother Two never raised or pointed his gun.

Mr. Funches testified that they did not call the police that night because Ms. Funches was afraid. He said Ms. Funches was scared because the brothers knew where she and Mr. Garrett lived, and they had threatened to kill Mr. Garrett. He said that after the incident, Mr. Garrett told him that he knew the brothers as security guards. He said that Ms. Funches did not know the brothers.

On redirect examination, Mr. Funches testified that at Lake Point Apartments, the brothers asked him "if [he] had anything" and if he had a gun. He said he thought they were asking him if he had any money or a gun. He said he thought the brothers still had their guns at Perkins Woods Apartments.

Tony Garrett testified that he had a felony conviction for possession of cocaine. He stated that on April 14, he, his fiancee Marti Funches, and her brother Christopher Funches attended a party at Lake Point Apartments. He said that they left the party at about 2:00 a.m. and that as they went down the stairs, he noticed the brothers exiting a gray Chevrolet Cavalier. He said the brothers approached him and told him to "drop it off." He said Brother One had a .38 caliber pistol and Brother Two had a 12-gauge gun. He said he told the brothers that he did not have any money, and one of the brothers hit him in the eye. He said the brothers then searched his pockets and took eight hundred dollars from him. He testified that the money was part of Ms. Funches's income tax refund check that they had cashed earlier that day.

Mr. Garrett testified that Ms. Funches panicked, and the brothers took about thirty dollars and a herringbone necklace from her. He said that the brothers asked Mr. Funches what he had on him but that Mr. Funches did not have anything. Mr. Garrett stated that the brothers

forced everyone into his car. He said that he was forced into the driver's side of the car, and one of the brothers got into the passenger's side and forced Mr. Garrett to drive to his and Ms. Funches's apartment at gunpoint. He said that Brother Two followed them in the brothers' car. He stated that the brothers made threats and told Mr. Garrett that he was going to die and that Ms. Funches was going to be a widow.

Mr. Garrett testified that he was forced into his apartment at gunpoint by Brother One while Mr. and Ms. Funches remained in the car with Brother Two. He said Brother One searched his apartment but did not find any money. He said Brother One forced him back outside, and the brothers patted him down again. He said the brothers left when they realized that he did not have any more money, but they threatened to kill him if anyone called the police. He stated that because of these threats, Ms. Funches did not want to the call the police that night but that the next day he convinced her that they should notify the police.

On cross-examination, Mr. Garrett testified that he recognized the brothers' car from the neighborhood. He said the brothers approached him together, and they were both armed. He said that when one of the brothers told him to "drop it off," he thought they were demanding money from him. He said he did not recall if the brothers said anything about him having a gun that belonged to them. He said the brothers also told Ms. Funches to "drop it off." He said they searched Ms. Funches and took the money that was in her purse, and he said they asked Mr. Funches what he had, but he did not have anything.

Mr. Garrett testified that at Perkins Woods Apartments, Brother Two threatened to shoot Mr. and Ms. Funches if they moved. He said that Brother One did not ask him about a gun. He said he was not an acquaintance of the brothers, but he had known them for about four months and knew they worked as security guards. He stated that he might have given the brothers his pager number and that he had seen them the week before the incident at EZ Pawnshop. He said he did not know what they were looking at, and he did not know if the brothers bought guns at the pawnshop. He stated that he had not seen the brothers armed until the robbery. He testified that he did not own any guns until after the incident. Mr. Garrett stated that the brothers had paged him once, but

they did not page him on the day of the incident, and he did not borrow a gun from them.

Mr. Garrett testified that he assumed Brother Two was carrying a 12-gauge gun because half of the gun was sticking out, and he knew what a 12-gauge gun looked like. He said that nothing was taken at Perkins Woods Apartments because the brothers had already taken everything. He said the brothers asked Mr. Funches if he had any money, but Mr. Funches told them that he did not. He testified that he and Ms. Funches stayed in a hotel after the incident.

Mr. Garrett was shown a photograph of the brothers, and he described the brother in photograph number 96400788-35 as the calm one. He stated that the defendant in the photograph appeared to be Linn Cook, but he was not positive because they were identical twins. He testified that he saw one of the brothers at Circle K after charges had been filed, and that brother begged him to drop the charges. He said he later saw the calm one, and he denied telling that brother that he pressed charges because he was embarrassed about being hit in front of his fiancee.

Marti Funches testified that she, Mr. Garrett, and her brother left the party at Lake Point Apartments at about 2:00 a.m. on April 14. She said that as they walked down the steps, the brothers jumped out of their car and approached them. She said that one of the brothers had his hand down by his side. She said that Mr. Garrett knew the brothers and that he stated, "What's up Deuce Man." She said Brother One pulled out a large silver .38 caliber gun, and she said it looked like Brother Two had a stick or a pipe. She testified that the bottom of the stairs was unlit and she panicked.

Ms. Funches testified that Brother One told Mr. Garrett to "drop that sh* * off" and then struck Mr. Garrett. She said Brother Two said "what you got" and took her necklace. She stated that Brother Two told her and Mr. Funches not to move. She stated that Brother One forced Mr. Garrett into the driver's side of his car and forced her and Mr. Funches into the backseat. She testified that Brother One told her that she was going to be a widow, and she said she thought she was going to die.

Ms. Funches testified that Brother One forced Mr. Garrett to drive to the apartment she shared with him, then Brother One forced Mr. Garrett into the apartment at gunpoint while Brother Two stayed with her and Mr. Funches. She said Brother One and Mr. Garrett were in the apartment for about four or five minutes, and when they came out, the brothers forced Mr. Garrett into his car, then they got into their car and left. She said the brothers stated that they would come back for them if they called the police. She said she and Mr. Garrett dropped off Mr. Funches at their mother's house, then she and Mr. Garrett spent the night at Mr. Garrett's mother's house. She said she did not want to call the police because she was scared, but Mr. Garrett convinced her the next day that they should notify the police.

On cross-examination, Ms. Funches testified that she recognized the brothers. She said she had been in the car a couple of times when Mr. Garrett had seen the brothers walking on the street and had given them a ride. She said Mr. Garrett told her that the brothers were security guards. She stated that she did not keep guns in the apartment that she shared with Mr. Garrett. She said that on the night of the incident, she did not hear either brother ask Mr. Garrett if he had a gun he was holding for them. She stated that the eight hundred dollars the brothers took from Mr. Garrett was part of the money from her income tax refund.

Ms. Funches testified that Brother Two pointed an object at Mr. Funches that looked like a pipe or a stick. She said Brother One asked Mr. Funches if he had a gun, but the brothers did not search or pat down Mr. Funches. She testified that Brother Two ripped off her necklace, and she gave them about thirty or thirty-five dollars. Initially, she said she gave them her money at Lake Point Apartments, but she later stated that she gave them her money at Perkins Woods Apartments. She said that she and Mr. Garrett's mother after the incident because all the hotels were booked. She said she was not aware of any guns kept in her apartment after the incident.

Officer Rodney Adair of the Memphis Police Department testified that he received a dispatch at about 3:00 p.m. on April 14 reporting shots fired at Lake Point Apartments. He said he spoke with security officers at the apartments who informed him that the suspects had

left and might be headed toward Getwell Gardens. He said the suspects were described as two black males, possibly twins, driving a gray, four-door Chevrolet Cavalier.

Officer Adair testified that as he pulled into Getwell Gardens, the brothers were pulling out in a gray Cavalier. He said he turned on his blue lights, stopped the car, and ordered the brothers out of the car. He said he drew his weapon because he had information that the suspects were armed and had fired shots. He said that the passenger got out of the car, raised his hands, and dropped to the ground as ordered. He said the driver got out of the car and raised his hands, and he noticed that the driver was wearing a shoulder holster but did not have a weapon. He said the driver was being difficult and would not get on the ground as ordered. He said another officer arrived about ten seconds later, and the driver finally complied.

Officer Adair testified that he patted down the passenger and found six rounds of .38 caliber ammunition in his hands. He said neither brother had weapons on them, but a search of the car produced two handguns and a shotgun. He said the weapons were in the front part of the car, and the shotgun and a handgun were loaded. He testified that ammunition was found in the trunk of the car.

On cross-examination, Officer Adair admitted that according to the arrest ticket, both brothers lay flat on the ground before other officers arrived. He testified that the barrel of the shotgun they recovered was hot, but he did not know if it was hot from lying in the sun. He said he had no knowledge of any spent shotgun shells or bullets found in the car.

Officer Paul Bishop of the Memphis Police Department testified that he was called to Eastwood Hospital at about 3:30 p.m. on April 14 to take a robbery report from the victims. He said that Mr. Garrett's left eye was swollen. He said he heard a call over the radio regarding shots fired, and he put out a broadcast regarding the robbery and kidnapping because he thought the descriptions of the suspects were similar.

Officer Monday Quinn of the Memphis Police Department testified that he received a call to go to Getwell Gardens on the report of shots fired. He said

10

that when he arrived, the brothers were out of their car, and Officer Adair had his gun drawn and was ordering them to get on the ground. He said the passenger complied, but the driver did not. He said he asked the driver his name, and the driver said he was Glenn Cook. He said the driver was wearing a shoulder holster. He stated that in the front of the car, he found a loaded, sawed-off shotgun containing six rounds of ammunition and two loaded .38 caliber handguns. He said he also found ammunition. On cross-examination, he stated that he did not see any spent shells in the car.

B.F. Hadaway, Jr., an investigator with the Tennessee Department of Commerce and Insurance Regulatory Boards, testified that the Boards regulate security companies and that one must go through a certain procedure to become a commissioned security officer in Tennessee. He said that one must file a lengthy application and undergo FBI and TBI background checks. He said that a person cannot work as an armed security guard in Tennessee until they have been certified by the state. The affidavit of Donna Hancock, Administrative Director of Tennessee Private Protective Security Guard Services, was admitted into evidence. In her affidavit, Ms. Hancock stated that a complete record search revealed that the brothers did not hold armed guard registration, nor was there any record of an application filed by the brothers. The brothers were convicted upon the foregoing evidence.

State v. Cook, 1999 WL 450321, at *1-6.

II.   PETITIONER'S FEDERAL HABEAS CLAIMS

In this § 2254 petition, Cook contends that:

(1)   Trial and Appellate counsel rendered ineffective assistance;

(2)   Prosecutorial misconduct and malicious prosecution violated his rights;

(3)   He was subjected to an unlawful arrest, illegal search, and illegal seizure;

(4)   The trial court's decision to limit cross-examination of certain law enforcement officers violated his rights; and

(5)   He is "actually innocent" of the criminal offenses of robbery and kidnapping.

(D.E. 1 at 4, 5, 7.)

## III. LEGAL STANDARDS

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.   Exhaustion and Procedural Default

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011). The petitioner must "fairly present"[4] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, Baldwin v. Reese, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L.

---

[4]   For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 277 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. Gray v. Netherland, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081 (1996).

Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, O'Sullivan v. Boerckel, 526 U.S. 837, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003); see Smith v. Morgan, 371 F. App'x 575, 579 (6th Cir. 2010) (the Adams holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-07, 52 L. Ed. 2d 594 (1977); see Coleman v. Thompson, 501 U.S.

722, 729-30, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732, 111 S. Ct. at 2555; see Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 322, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); Coleman, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. Schlup, 513 U.S. at 321, 115 S. Ct. at 864; see House v. Bell, 547 U.S. 518, 536-539, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d 1 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

14

Petitioner's post-conviction proceedings were governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122.[5] A one-year statute of limitations governed the filing of petitions. Id. at § 40-30-102. In this case, Petitioner's right to file any further state post-conviction petition is barred by the one-year statute of limitations. Petitioner does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.[6]

B. Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

_____

[5] The act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim, such as that a claim was waived for failure to present it or previously determined after a full and fair hearing. See Tenn. Code Ann. § 40-3-106(f-h).

[6] The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations for post-conviction relief. Hannah v. Conley, 49 F.3d 1193, 1196-97 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). The Tennessee limitations rule has been held to constitute a "firmly established and regularly followed state law" and "adequate" to uphold a conviction. Mason v. Tennessee, No. 1:04-000112, 2011 WL 336142, **12-13 (M.D. Tenn. Jan. 28, 2011) (citing Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002)).

> (2)  resulted in a decision that was based on an
> unreasonable determination of the facts in light of
> the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (quoting Harrington v. Richter, 562 U.S. ___, ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011), and Woodford v. Viscotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (per curiam)).[7]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[8] An "unreasonable application" of federal

---

[7]    The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522, 146 L. Ed. 2d 389 (2000)).

[8]    The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365,
(continued...)

law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13, 120 S. Ct. at 1523. The state court's application of clearly established federal law must be "objectively unreasonable." Id. at 409, 120 S. Ct. at 1521. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. Renico v. Lett, ___ U.S. ___, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (citing Williams, 529 U.S. at 411, 129 S. Ct. at 1522).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in Wood v. Allen, ___ U.S. ___, ___, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas

---

<sup>8</sup>    (...continued)
154 L. Ed. 2d 263 (2002) (per curiam); see Mitchell v. Esparza, 540 U.S. 12, 16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (same); Treesh v. Bagley, 612 F.3d 424, 429 (6th Cir. 2010) (same).

review that does not suffice to supersede the trial court's . . . determination."[9]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.' [Miller-El v.] Dretke, 545 U.S. [231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005)] (quoting Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (internal quotations omitted)). Accordingly, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.' Cockrell, 537 U.S. at 324, 123 S. Ct. 1029." Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir. 2008). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010); see Hudson v. Lafler, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

IV.  ANALYSIS OF PETITIONER'S CLAIMS

Cook raised the ineffective assistance of trial counsel during the appeal of the denial of post-conviction relief. (D.E. 16-20 at 6, 11-17.) Specifically, Cook contended that his trial

---

[9]     In Wood, 120 S. Ct. at 845, 848, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. Id. at 849, 851. In Rice, 546 U.S. at 339, 126 S. Ct. at 974, the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable.

attorney failed to investigate, interview, or contact arresting Officers Justin D. Fox, Rodney Adair, Monte Quinn, or Paul Bishop before trial, visited him only one or twice before trial, failed to discuss trial strategies with him, failed to file a motion to suppress and a motion in limine, failed to subpoena Officer Justin Fox, failed to subpoena eyewitness Kesha Hare, and failed to investigate his history of paranoid schizophrenia (Id. at 12-13.) The Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief. Cook v. State, 2008 WL 821532, at *8-10.

Cook did not present any issue ineffective assistance by appellate counsel or issues two through five to the Tennessee Court of Criminal Appeals for determination.  A prisoner does not fairly present his claim to the state courts by providing the facts that form the basis for the claim. Picard v. Connor, 404 U.S. 270, 277, 92 S. Ct. 509, 513, 30 L. Ed. 2d 438 (1971). No further avenue exists for exhausting these claims and, therefore, they are barred by procedural default.

Cook cannot excuse his procedural default by arguing that the failure to exhaust these issues in state court is attributable to his post-conviction counsel. There is no constitutional right to the effective assistance of counsel in state post-conviction proceedings. See Coleman, 501 U.S. at 752-54, 111 S. Ct. at 2566-67; Pennsylvania v. Finley, 481 U.S. 551, 554, 107 S. Ct. 1990,

19

1993, 95 L. Ed. 2d 539 (1987); <u>see also</u> 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

To the extent that Cook contends that issue five, his actual innocence, is grounds for equitable tolling, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." <u>Herrera v. Collins</u>, 506 U.S. 390, 404, 113 S. Ct. 853, 862, 122 L. Ed. 2d 203 (1993), <u>reh'g denied</u> (Mar. 22, 1993). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. <u>Bousley v. United States</u>, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998) ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency."). In this case, Petitioner is asserting a freestanding actual innocence claim, that is, a claim of actual innocence that is not used to excuse the procedural default of another claim. The claim is totally conclusory. Petitioner provides no newly discovered evidence to support his claim. Although the Supreme Court has suggested that it may recognize freestanding actual innocence claims in capital cases, <u>see</u> <u>Herrera</u>, 506 U.S. at 417, 113 S. Ct. at 869, it has not done so in noncapital cases such

20

as this one. Cook's claim that appellate counsel provided ineffective assistance and issues two through five are DENIED.

Cook contends that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687, 104 S. Ct. 2052." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

<u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.[10] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [<u>Srickland</u>, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' <u>Id.</u>, at 687, 104 S. Ct. 2052." <u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 787-88; <u>see also id.</u> ___, 131 S. Ct. at 791-72 ("In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); <u>Wong v. Belmontes</u>, ___ U.S. at ___, ___, 130 S. Ct. 383, 391-92, 175 L. Ed. 2d 328 (2009) (per curiam) ("But <u>Strickland</u> does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, <u>Strickland</u> places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

---

[10]     "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>Id.</u>

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. ___, ___, 130 S. Ct. 1473, 1385, 176 L. Ed. 2d 284 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S. Ct. 2052; see also Bell v. Cone, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S. Ct. 2052.

Richter, ___ U.S. at ___, 131 S. Ct. at 788.

The deference to be accorded a state-court decision is magnified when reviewing an ineffective assistance claim under 28 U.S.C. § 2254(d):

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 104 S. Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles [v. Mirzayance], 556 U.S., at ----, 129 S. Ct. at 1420 [(2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts

23

must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Id.</u> at ___, 131 S. Ct. at 788.

The Court of Criminal Appeals summarized the evidence presented at the post-conviction hearing as follows:

The post-conviction hearing occurred on two days. During the first post-conviction hearing, which was conducted on July 25, 2005, Cook testified that trial counsel should have called Officer Justin Fox to testify at trial to impeach the testimony of other officers concerning their involvement in the case. He also argued that the arrest ticket was falsified by police. He said that Officer Fox's testimony indicated that he did not arrest Cook even though his name was on the arrest ticket. Cook claimed that the arrest ticket was falsified so the State could maliciously prosecute him and his brother.

Cook also argued that his attorney was ineffective because she only met with him once or twice while he was in jail and did not discuss trial strategy. He said he asked her to file a motion to suppress, but she failed to do so. Cook said he and his brother were never involved in a robbery or a kidnapping. He argued that the victims were "manufactured" and that he and his brother did not know them. Cook said that trial counsel failed to utilize the officer's testimony to impeach the State witnesses.

Cook testified that trial counsel did not share any discovery or discuss trial strategy with him. He said that neither his attorney nor his brother's attorney presented a defense for them at trial. Cook testified that counsel did not contact or interview any of the witnesses they suggested.

Cook said that he and his brother were both diagnosed with paranoid schizophrenia, but trial counsel did not investigate his illness. He said trial counsel did not communicate with him about his potential sentencing exposure and should have filed a motion to

suppress the initial stop because the officers had fabricated probable cause.

During cross-examination, Cook testified that his attorney did nothing and that his brother's attorney offered the only argument before the court. He said that both of the officers listed on the arrest ticket testified at trial as to a "shots-fired" call but not to a robbery and kidnaping. All of the three alleged victims testified during the trial about a robbery that occurred to them at the hands of Cook and his brother. Cook said that he wanted a jury trial but said that the lack of action by his trial counsel allowed only the state's version to be presented to the jury. He also said that, because he was "gagged" by the judge, he did not have an opportunity to tell counsel the questions he wanted her to ask during cross-examination.

When confronted with his testimony during voir-dire, Cook agreed that he said he had reviewed the case with counsel. He also acknowledged that he testified that he had met with counsel several times regarding testimony elicited during the course of the trial. Further, he said he had met and discussed the case with counsel and had decided not to testify on his own behalf. Cook also said that counsel told him there was no need for him to testify because they were going to use the testimony of Officer Fox. He said they were led to believe counsel would call Officer Fox but, as soon as he agreed not to testify, counsel rested his case. He said he did not raise this to the trial judge at the time because he had been gagged by the trial judge and would have been removed from the courtroom if he had said anything.

Cook said that all the alleged victims were lying and that the offenses never occurred. Cook said counsel should have interviewed the person who owned the home where the events were alleged to have occurred. He said she was an alleged eyewitness and should have been called to testify.

The defense rested their proof at the conclusion of Cook's testimony. The hearing was then continued until September 22, 2005. Trial counsel testified that she was appointed to represent Cook at trial. Counsel testified that she had trouble with Cook during most of the time she was appointed to represent him. She said that she had tried one other criminal case involving an aggravated

burglary. Counsel said she only recalled filing one motion in the case, and it was a motion for discovery. However, she was unable to locate her file in this matter and could not be certain that was the only motion filed. Counsel said that she ordinarily preserves her client files for a three-year period to a five-year period.

Counsel did not recall filing any written pretrial motions but did make an oral motion in limine before trial. She recalled Cook complaining that she did not file thirty-six motions. She believed the number "thirty-six" came from Cook being charged previously with other, more serious crimes that might require that many pretrial motions. Counsel testified that she did not recall any specific motions Cook asked her to file.

Counsel testified that she felt like she properly represented Cook. She said Cook filed a complaint with the Board of Professional Responsibility and complained that she did not make an objection to certain testimony regarding whether the police were responding to a "shots fired" call. It was her contention that she did make an objection at the outset and that the objection was continuing in nature. She said she shared the discovery materials with Cook.

Counsel testified that she was not aware that she could have asked for an investigator to be appointed to Cook. She believed that her investigation and the investigative work conducted by his brother's counsel was sufficient. Counsel said that she did not interview the State's witnesses prior to trial. She went to the scene of the alleged crime. Counsel did not issue any subpoenas and did not put on any proof.

On cross-examination, counsel testified that she met with Cook ten to fifteen times prior to trial. She said she was unable to locate one of the people Cook wanted to testify. She participated in the cross-examination of the State's witness but let counsel for the co-defendant go first in cross-examination because the co-defendant's name was first on the indictment. If counsel for the co-defendant did not ask questions that she felt were necessary, she asked those questions. Counsel testified that it is her policy to ask her clients if they have additional questions they want asked before she finishes questioning the witnesses. She then makes an independent decision about whether or not their questions are

relevant. She made sure Cook participated in the trial
process, including questioning and jury selection.
Counsel said that she tries to provide the client a copy
of the entire file and that it mirrors closely the file
she uses, with the exception of her attorney work
product.

Counsel recalled having Cook evaluated because he
had complained of problems with schizophrenia. She said
that testing revealed he was competent to assist in
preparation for trial and was competent to understand the
consequences of his conduct.

Cook v. State, 2008 WL 821532 at *6-8.

In this petition, Cook contends that his "trial
[attorney] induced and engaged in illegal and inappropriate conduct
by deliberately suppressing the exculpatory evidence of the
arresting officer Justice D. Fox's preliminary hearing testimony
that shows and proves the arrest ticket and charges to be in fact
false and exonerated [his] brother and [him] and refutes the
state's case and would have impeached the testimonies of officer
Paul Bishop and the manufactured victims." (D.E. 1 at 4.) Cook
alleges that his attorney "failed to subpoena or call officer Fox
to testify at trial or cross-examine officers Rodney Adair and
Monday Quinn about this alleged robbery and kidnapping." (Id.)
These issues were presented to the Tennessee Court of Criminal
Appeals as claims that counsel "never investigated, interviewed, or
contacted any of the arresting officers, Justin D. Fox, Rodney
Adair, Monte Quinn, or Paul Bishop before trial," (D.E. 16-20 at 9)
and "never interviewed, contacted, or subpoenaed any witnesses on

[Cook]'s behalf." (Id. at 10.).   The Court of Appeals reviewed the claims and denied relief on the merits, stating as follows:

Specifically, the petitioner argues that counsel was ineffective for failing to: interview the State's witnesses prior to trial; discuss trial strategy with him prior to trial; file motions that he wanted filed; and subpoena two witnesses, Officer Fox and Keisha Hare, he deemed important to his defense. Additionally, the petitioner contends that counsel was ineffective for failing to use his history of schizophrenia to his advantage.

This court reviews a claim of ineffective assistance of counsel under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn.1975), and Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. Goad, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The test in Tennessee to determine whether counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; State v. Honeycutt, 54 S.W.3d 762, 769 (Tenn.2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an

objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065).

In reviewing counsel's conduct, a "fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997); Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Here, the post-conviction court found that the police officer's testimony would not have provided any help to the petitioner since the officer's testimony during the preliminary hearing did not contradict any of the testimony elicited at trial. Further, we note the petitioner did not call Officer Fox to testify at his post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. Id. Therefore, this issue is waived.

With regard to the petitioner's contention that counsel was ineffective for not producing Keisha Hare as a witness at trial, we also conclude the issue is without merit. The petitioner did not provide any valid

information to aid counsel in locating the proposed witness. Counsel testified that she unsuccessfully tried to locate the witness. Because he failed to produce the proposed witness during the post-conviction hearing, the petitioner has waived this issue. See Id.

The post-conviction court found that counsel was not ineffective in her investigation of the petitioner's case. The petitioner contends that counsel was not adequately prepared to defend his case and specifically contends that counsel's failure to interview the witnesses for the State was prejudicial to his case. It is the petitioner's burden to establish that there existed a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Here, the petitioner has not provided any proof that additional investigation would have been beneficial. He has not produced any witnesses who could substantiate his claims that there were inconsistencies in the evidence. We conclude that the petitioner has failed to show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. It might have been beneficial for counsel to interview the police prior to trial but "might" is inadequate for the petitioner to meet his burden. Counsel testified that she had all the discovery materials she felt she needed, including the arrest ticket and related materials, to review prior to trial.

In his brief, the petitioner makes a brief mention that he was greatly prejudiced by the absence of a motion to sever his case from that of his twin brother. However, he provides no authority to support his contention. This issue is waived as the petitioner has failed to cite authority to support his argument. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

The petitioner also contends counsel was ineffective for failing to contact his friends and doctors regarding his diagnosis as a paranoid schizophrenic. However, the State correctly points out that counsel testified she had the petitioner evaluated and the resulting diagnosis found him to be competent to stand trial and participate in his defense. Again, the petitioner failed to call any witnesses to support his contentions and has failed to meet his burden of proof.

> With regard to the effective assistance of trial
> counsel, the petitioner has failed to meet his burden of
> proof, and the judgment from the trial court is affirmed.

Cook v. State, 2008 WL 821532 at *8-*10.

The Tennessee Court of Criminal Appeals cited and applied the Supreme Court's decision in Strickland v. Washington. Id. at *8-9. The state court then relied on Strickland to determine that trial counsel was not ineffective. Cook makes no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to Strickland,[11] although he disagrees with the determination that he failed to show either deficient performance or prejudice. Cook has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, Strickland, or that it was based on an unreasonable determination of the facts.

The Tennessee Court of Criminal Appeals did not expressly address a claim that trial counsel failed to cross-examine Officers Rodney Adair and Monday Quinn about the robbery and kidnapping. During the post-conviction hearing, Cook testified that Adair and Quinn "testified on behalf of the prosecution about their response to a shots-fired call; never a robbery and kidnapping" and that

---

[11]   The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

counsel did not question the officers about the robbery and kidnapping. (D.E. 16-11 at 25, 29.) Cook admitted on cross examination, however, that counsel did cross-examine the officers, just not about the robbery and kidnapping. (Id. at 30.) He also admitted that those officers testified about the things they observed and in which they participated and could not testify about something for which they were not present. (Id. at 26.)

Based on this Court's review of the transcript of Cook's preliminary hearing, including the testimony of Officer Fox (D.E. 16-10 at 3-12), and the transcript of Cook's trial, including the testimonies of Officers Adair and Quinn, (D.E. 16-4 at 340-375, 387-403), it is apparent that these officers' involvement in the case occurred during the apprehension and investigation of the Cooks for an unrelated offense. No testimony by Fox, or further cross-examination of Adair and Quinn, would have assisted Petitioner in disproving the charges of robbery and kidnapping for which he was convicted. Furthermore, Cook did not call any of the officers to testify during his post-conviction hearing. A defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice. See Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983).

Cook's conclusory allegations are not sufficient to demonstrate either deficient performance or an unreasonable determination of the facts in light of the evidence presented at

the state-court hearing, as required by 28 U. S.C. § 2254(d)(2).
Thus, the exhausted portion of issue one is without merit and is
DENIED.

Because the issues raised by Cook are without merit, the
Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for
Respondent.

V.    APPEAL ISSUES

There is no absolute entitlement to appeal a district
court's denial of a § 2254 petition. Miller-El v. Cockrell, 537
U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003);
Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005). The
Court must issue or deny a certificate of appealability ("COA")
when it enters a final order adverse to a § 2254 petitioner. Rule
11, Rules Governing Section 2254 Cases in the United States
District Courts. A petitioner may not take an appeal unless a
circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1);
Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a
substantial showing of the denial of a constitutional right, and
the COA must indicate the specific issue or issues that satisfy the
required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial
showing" is made when the petitioner demonstrates that "reasonable
jurists could debate whether (or, for that matter, agree that) the
petition should have been resolved in a different manner or that

the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El, 537 U.S. at 336, 123 S. Ct. at 1039 (citing Slack v. McDaniel, 529 U.S. 473, 84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000)); Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same), cert. denied, ___ U.S. ___, 129 S. Ct. 1057, 173 L. Ed. 2d 482 (2009). A COA does not require a showing that the appeal will succeed. Miller, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. Bradley, 156 F. App'x at 773 (quoting Slack, 537 U.S. at 337, 123 S. Ct. at 1039).

In this case, there can be no question that the claims in this petition are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

Federal Rule of Appellate Procedure 24(a)(3) provides that a party who was permitted to proceed in forma pauperis in the district court may proceed on appeal in forma pauperis unless the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal in forma pauperis. In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R.

App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal in forma pauperis is DENIED.[12]

IT IS SO ORDERED this 16th day of March, 2012.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[12]    If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. See Fed. R. App. P. 24(a)(5).